RECEIVED

MAY 2 3 2011

TONY R. MOORE, CLERK
BY_____
    DEPUTY

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

PARIS SANDERS, ET UX.

                                 CIVIL ACTION NO. 09-1424

versus                             JUDGE TOM STAGG

THE UNITED STATES OF AMERICA

## MEMORANDUM RULING

This dispute arises as an action for damages under the Federal Tort Claims Act, filed by the plaintiffs Paris Sanders and Cindy Sanders against the United States, resulting from injuries sustained by Mr. Sanders and Mrs. Sanders's loss of consortium.

Having heard the trial testimony presented and read the depositions and exhibits, the court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 and rules as follows:

## I. FINDINGS OF FACT[1]

On January 25, 2007, Mr. Sanders presented to the Overton Brooks VA

---

[1] The findings of fact have been found by the court from the testimony, depositions, and exhibits received in evidence and from credibility choices common in every trial.

1

Medical Center ("the VAMC") and was treated by Dr. Ngoc Nguyen. Mr. Sanders was 46 years old and had a history of right hip pain and mild disc bulge in his lumbar spine, as a result of a fall two years earlier. At that time, he was employed as a maintenance supervisor for Barrett Davis Properties. See Record Document 37 at 44-45. He was in charge of all electrical, air conditioning, and plumbing repairs for multiple apartment complexes. See id.

On Thursday, January 25, 2007, Dr. Nguyen administered an injection of methylprednisolone 40 milligram (steroid) and Marcaine 2 cubic centimeter into Mr. Sanders's right sacroiliac joint. Following the injection, Mr. Sanders developed an infection. He reported to the emergency room on Saturday, January 27, 2007, and Sunday, January 28, 2007, with complaints of increasing pain at the injection site and fever. See Joint Ex. A at 51-52. He was subsequently seen by Dr. Nguyen at the VAMC eight times in early 2007: January 29, February 1, February 6, February 7, February 12, February 20, March 1, and March 29. See id. at 85-86. On March 29, 2007, Dr. Nguyen recommended a general surgery consult. See id. A month later, on April 25, 2007, a computed tomography ("CT scan") was administered, showing a mass 4 centimeters by 4 centimeters by 8 centimeters centered within Mr. Sanders's medial right paraspinous muscle. See id. at 22-23.

Finally, on May 8, 2007, some fourteen weeks after the injection, Mr. Sanders

underwent irrigation and debridement ("I & D") surgery for the treatment of two abscesses, one in his right buttock and one in the paraspinous muscles of his lower back. See Record Document 32 at 35; Joint Ex. A at 702-03. One week later, on May 15, 2007, Mr. Sanders underwent a second I & D surgery on the abscess in his right buttock, which required removal of the stitches and further irrigation of the wound. See Joint Ex. A at 697-98. The incision was left open for additional drainage and packed with wet-to-dry dressings. See id. Mr. Sanders now experiences chronic pain in his lower back, right buttock, leg, and foot.

## A. Prior Medical Condition.

In January of 2005, prior to his treatment at the VAMC, Mr. Sanders fell from a ladder and suffered injury to his lower back. He was treated at Willis-Knighton Bossier by doctors Caroline Burton and Sudar Tanga from January of 2005 through July of 2006. See Plaintiffs' Ex. 2. Mr. Sanders testified that he fell from a ladder onto "my butt and it hurt around my waist line. And it was radiating down from my waist." Record Document 37 at 21. He further explained that it felt "like something grinding in my back, but it was like, radiating into my upper thigh area." Id. at 22. Dr. Burton conducted a magnetic resonance imaging ("MRI") in May of 2005 and concluded that Mr. Sanders had a mild disc bulge. See Plaintiffs' Ex. 2. She advised Mr. Sanders to see Dr. Tanga for pain management.

Dr. Tanga prescribed Mr. Sanders 5 milligrams of methadone twice a day for his pain and instructed him to take only half, or 2.5 milligrams, twice a day for the first week. See Record Document 37 at 22. Mr. Sanders testified that he found half of one pill more than adequate, so he broke the 5 milligram pills into four pieces, taking a quarter, or 1.25 milligrams, at approximately 7 a.m. and 7 p.m. every day. See id. at 22-23. Mr. Sanders explained that this medication regime "completely wiped [the pain] out." Id. at 22. He testified that he slept well at night and did not feel any pain in the morning, he was able to function at work, and he finished building on his house. See id. at 23. He explained, "I could tell [the injury] was there but I didn't have any pain from it unless I picked up something really heavy. And then it would hurt for, like, a weekend. And then it would go back to the way it was." Id. His testimony is supported by the medical records. On March 13, 2006, Dr. Tanga noted that "his pain is very well controlled with the help of [m]ethadone." Plaintiffs' Ex. 3 at 5. Similarly in May and August of 2006, Dr. Tanga reported that Mr. Sanders's pain was "significantly better with the [m]ethadone" and "fairly well controlled with [m]ethadone." Id. at 7, 10. After Mr. Sanders lifted a heavy object in April of 2006, Dr. Tanga documented that "[h]e complains of muscle spasms on the right side," but "[h]e does not complain of significant leg pain." Id. at 6.

Mr. Sanders's employer terminated the health insurance coverage for its

4

employees in August of 2006, and Mr. Sanders subsequently sought treatment at the VAMC. On his first visit to the VAMC in January of 2007, Mr. Sanders met with primary care physician Dr. Rama Kakani. Dr. Kakani documented that Mr. Sanders's "chief complaint is pain in the back, mostly in the right hip area radiating to the posterior aspect of the leg up to the knee." Joint Ex. A at 693. He also noted that in "the straight leg raising test, there was only minimal pain, but there is no radiation." Id. During Mr. Sanders's first visit with Dr. Nguyen on January 25, 2007, Dr. Nguyen noted that "there is a localized tender point on the [right] SI [joint], painful to deep palpation," but the "pain is not radiating." Joint Ex. B at 3.

As mentioned, Dr. Nguyen administered an injection into Mr. Sanders's sacroiliac joint on January 25, 2007. Mr. Sanders soon developed an infection, which was not alleviated until he underwent surgery for the abscesses on May 8 and May 15 of 2007.

## B. Post-Operative Medical Condition.

Following surgery in May of 2007, Mr. Sanders continued as a patient at the VAMC, under the care of Dr. Srimathi Tanga[2] and Dr. Nguyen. Mr. Sanders's

---

[2] There are two persons referred to as "Dr. Tanga" in this case. Dr. Srimathi Tanga is Mr. Sanders's primary care physician at the VAMC. See Joint Ex. B at 1. Dr. Sudar Tanga was Mr. Sanders's pain management physician at Willis-Knighton Bossier. See Plaintiffs' Ex. 3.

wounds healed and he returned to work full-time five weeks after surgery. See Record Document 37 at 32. Despite his recovery, he still experienced pain. In July of 2007, Dr. Tanga referred Mr. Sanders to neurology based upon a perceived weakness in his right lower extremity and complaints of back pain. See Joint Ex. A at 800; Record Document 33 at 26-27. On July 19, 2007, Mr. Sanders was seen for the first time by Dr. Angela Wamer, a neurologist at the VAMC. See Joint Ex. A at 801. Dr. Wamer noted that Mr. Sanders complained of "right leg pain localized to just below right buttock and raiducular [sic] down posterior thigh below the knee" and that "[h]e states his leg will buckle if he puts weight on it." Id. Upon exam, she found "no focal weakness." Id. Her impression was "right leg neuralgia[3] - likely related to local irritation at site of gluteal abscess." Id. Dr. Wamer started Mr. Sanders on a trial of gabapentin and lidocaine for pain relief.[4] See id. He was already taking Lortab and methadone for his low back pain. See id.

Dr. Wamer saw Mr. Sanders again on August 22, 2007. She noted that "he

---

[3] Neuralgia means "acute paroxysmal pain radiating along the course of one or more nerves usually without demonstrable changes in the nerve structure." Merriam-Webster's Collegiate Dictionary 780 (10th ed. 1996).

[4] Gabapentin and lidocaine are medications used to treat peripheral nerve injuries. See Record Document 32 at 37. Dr. Francisco Luque, one of Mr. Sanders's neurologists, explained that gabapentin is a "channel blocker" that "quiets the nerve." Record Document 33 at 21.

reports pain localized to the right posterior thigh and traveling down back of leg to calf. Says back of leg 'draws up.'" Id. at 803. The record further indicates that Mr. Sanders "denies ever having radicular pain in leg until he was given injection in hip by Dr. Nguyen." Id. Mr. Sanders experienced pain upon toe-walking and heel-walking. See id. Dr. Wamer continued him on gabapentin nightly and started him on a trial of Lidoderm patches.

Dr. Francisco Luque first saw Mr. Sanders on October 31, 2007, to review an MRI taken on October 7, 2007. Dr. Luque serves as Chief of Neurology at the VAMC. He reported that the MRI showed "some residual inflammatory changes at the right lower paraspinal muscles," indicating scar tissue. Joint Ex. A at 804; Record Document 33 at 33. Dr. Luque increased Mr. Sanders's dose of gabapentin to 300 milligrams, three times a day. See Record Document 33 at 37. Dr. Luque continued to see Mr. Sanders every six months. In September of 2008, Dr. Luque reported that Mr. Sanders suffers from chronic pain and increased his dose of gabapentin to 600 milligrams, three times a day. See Joint Ex. A at 809. On February 26, 2009, Dr. Luque altered Mr. Sanders's dose of gabapentin to 600 milligrams in the morning and 1200 milligrams at night. See id. at 811.

Mr. Sanders also continued to see Dr. Nguyen every month or two, throughout the fall of 2007 and spring of 2008, for pain management. In August of 2007, Dr.

Nguyen documented that "[f]or the last 2 weeks [Mr. Sanders's] pain has been exacerbating radiating to the [right] leg." Joint Ex. B at 18. He also noted that Mr. Sanders's pain was up to a six out of ten and increased his dose of methadone to 10 milligrams every 12 hours. See id. At this time, Mr. Sanders was also taking 10 milligrams of Lortab, three times a day. See Record Document 32 at 44. In October of 2007, Dr. Nguyen reported that Mr. Sanders was in "no pain distress" and was "ambulatory without asistive [sic] device," but that his lower back and leg pain was "constant and deep." Joint Ex. B at 20. In December of 2007, Dr. Nguyen noted that Mr. Sanders's lower back pain is "constant" and there was "deep radiating at time to the [right] leg with paresthesia[5] of the [right] foot." Id. at 21. He also observed Mr. Sanders limping on his right leg. See id. In May of 2008, Dr. Nguyen increased Mr. Sanders's dose of methadone by 5 milligrams a day. See id. at 24; Record Document 32 at 45. In December of 2008, Dr. Nguyen again increased his dose of methadone to 10 milligrams every eight hours. He also prescribed him 350 milligrams of Soma, to take as needed for muscle spasms. See Joint Ex. B at 30; Record Document 32 at 47.

Mr. Sanders has continued to take methadone, Lortab, gabapentin, and Soma

---

[5] Paresthesia is a numbness or tingling sensation. See Record Document 32 at 43.

to manage his lower back and right leg pain. See Record Document 32 at 49. At the time of trial, Mr. Sanders was taking 20 milligrams of methadone and 10 milligrams of Lortab twice a day, in the morning and at night. See Record Document 37 at 36. He was instructed to take 600 milligrams of gabapentin in the morning and 1200 milligrams at night. See id. He testified, however, that he only takes gabapentin at night because "it just literally makes you drunk" and causes him to see light tracers. Id. He also takes muscle relaxers as needed. See id.

When asked to describe his current pain, Mr. Sanders stated:

[I am] still having pain. My entire right leg is – it's a pain when I wake up in the morning and open my eyes. It's a shock to my system. And stepping out of bed for the first time every morning is a shock. It's a complete shock to my body. And I take my pills. And after I walk a few minutes, I get used to the pain again. And it feels like I've got a rock grinding into my hip bone where the scar is. I've got pain going all the way down the back of my leg. My right side of my leg below my knee is numb except for the pain. I can't feel it to touch it, but I have a – I feel a pain. That's all I can feel all the way down to my foot.

Id. at 33. He stated that the medications help, but he still has pain. See id. at 35. He explained that his pain fluctuates during the day, depending on his activities, with the worst pain at about an 8 out of 10. See id. at 38. With regard to his post-surgery pain as compared to his pain before the injection and infection, he testified to the following:

Q.     At any time while you were under the care of Dr. [Sudar] Tanga,

9

did you have pain down the back of either leg?

A.   No, never down the back of my leg.

Q.   Did you have pain below the knee of either leg?

A.   No, never below the knee.

Q.   Did you have any pain in either of your feet?

A.   No. My feet were fine.

Q.   Did you have any areas of numbness or tingling in your legs while you were under the care of Dr. Tanga?

A.   No. My leg – physically my leg, I knew it wasn't the problem, but that's where the pain radiated.

Id. at 72-73.

Mr. Sanders testified that, since his surgery, he has continued to work full-time as a maintenance supervisor. See id. at 39, 59. At the time of the injection and for approximately one year afterwards, he worked for Barrett Davis Properties. See id. at 44-45. He currently works for U. L. Coleman, as the maintenance supervisor at Southwood Apartments. See id. at 20. His job description remains the same, and he continues to perform the same tasks he did prior to the incident, including crawling under houses, climbing stairs, carrying equipment, and squatting down to make repairs. See id. at 45, 55, 59-62. His current employer does not know of his injuries. See id. at 96.

10

Mr. Sanders testified that during the work week he meets his dad to play pool every day during his lunch break. See Record Document 37 at 41. When asked what he does during the evenings and on the weekends, Mr. Sanders replied, "I go lay down . . . . I just go home and go to bed." Id. at 40-41. He explained that this is partly because of "the volume of drugs," but mainly because "it hurts so bad" and "[t]he only break I get is when I get off my feet and lay flat and get off the leg." Id. He testified that his wife wants to go do things but he never feels like doing anything and he feels badly about this. See id. at 42. Mr. Sanders also stated that he and his wife no longer have sex, which he speculated is due to the medication. See id. He stated that the medication he was taking before the incident did not affect their sexual relationship. See id. at 43.

On cross examination, Mr. Sanders acknowledged that he sometimes works on Saturdays, if there is a service call, which may be a couple of times a month. See id. at 57. He admitted that he is physically capable of activity outside of work, but he explained that he needs time to let the swelling in his leg subside and otherwise rest. See id. at 57-58, 64-65. He also acknowledged that he was depressed before the incident at the VAMC, but he maintained that he and his wife did not have any problems before the incident. See id. at 52-53.

Mr. Sanders's wife, Cindy Sanders, also testified. She stated that, after Mr.

Sanders's surgery, she had to pack the surgical incision on his buttock with saline soaked gauze twice a day for approximately two weeks. See Record Document 37 at 98-99. She explained that the swelling is now gone but an indentation remains in his buttock. See id. at 101. When asked to describe a typical day, she explained that, in the morning, she brings Mr. Sanders his medicine and helps him put on his socks and shoes. See id. at 93-94. When he comes home from work in the evening, he goes into their bedroom, turns on the television, and lies down. See id. at 92. She stated that she brings him his dinner and he stays in the bedroom all evening. See id. He falls asleep, but she always wakes him up at midnight to take his medicine. See id. Mrs. Sanders testified that Mr. Sanders regularly screams in the middle of the night from pain, which wakes her up. See id.

Mrs. Sanders recounted that sometimes Mr. Sanders's right leg gives out when he is walking, which is humiliating for him, and that "he's real depressed now, because you know he doesn't feel like doing anything." Id. at 94-95, 97. According to Mrs. Sanders, they have not been out to dinner as a family in months and they argue because he never wants to go anywhere. See id. at 93, 97. Mrs. Sanders explained that Mr. Sanders has to go to work because they lose $150 for every day he misses and his new employer, U. L. Coleman, does not know about his injuries or medications. See id. at 94, 96. She believes Mr. Sanders must hide his injuries or

12

risk being fired. See id. at 96. She told the court that this experience has been very emotional for her and confirmed that she and Mr. Sanders no longer enjoy a sexual relationship. See id. at 104.

In response, the government called Bill Ray ("Ray"), a private investigator and former detective with the Bossier Parish Police Department. The government hired Ray to conduct video surveillance of Mr. Sanders from March 4, 2010, through July 10, 2010. The government offered the video footage into evidence. The video shows Mr. Sanders at work and play on fourteen separate days over the four month period. The tape depicts Mr. Sanders walking up and down stairs, loading his truck with equipment, and climbing in and out of his truck. The video also shows Mr. Sanders playing a knife game with his son called "Stretch," which required both men to stand with their feet widely apart and to throw a pocket knife at the ground. Mr. Sanders did not appear to struggle through these activities and did not require an assistive device. When asked about the video footage, Mr. Sanders explained that he has good and bad days and that during periods of more severe pain, he hides out in a storage room for approximately 15 to 20 minutes to rest. See Record Document 37 at 38-39. He further testified that he tries not to limp or appear injured while at work, because he does not want his employer to know he is injured. See id. at 39, 75. He stated that he only used his cane for a week or two after the surgery but keeps it in his truck in

case he needs it. <u>See</u> <u>id.</u> at 54.

Both parties also presented testimony by expert witnesses through depositions and expert reports. The plaintiffs offered Dr. Peter Grays as an expert in general surgery.[6] Based on his review of Mr. Sanders's medical records, Dr. Grays testified that Mr. Sanders suffered injury to the sciatic nerve as a result of the abscesses. <u>See</u> Plaintiffs' Ex. 8 at 20. When asked if he could say "more probably than not that the nerve was injured as a consequence of the delay" in treatment, Dr. Grays stated, "Yes, I do think in all medical probability it was due to the delay in treatment." <u>Id.</u> He stated that the injury to Mr. Sanders's sciatic nerve is difficult to quantify, but he explained that "when there's a delay, there's more infection, there's more purulence, there's more damage to surrounding structures by pressure, by infection." <u>Id.</u> at 25, 28. He acknowledged that there was no negligence in the administration of the injection and that even under the best medical care, an infection can develop after an injection such as this one, causing a certain amount of damage. <u>See</u> <u>id.</u> at 27-28. Dr. Grays explained that, with optimum medical care, "you're still going to have infection and inflammation and fibrosis, but with earlier treatment, it's going to be less. I mean, if you allow it to stay for four months as opposed to two weeks, that's a

_____

[6] Dr. Grays is board certified in general surgery and has practiced continuously since 1994. He did not examine Mr. Sanders at any time.

significant abscess – significant amount of inflammation that's spreading and damaging." Id. He concluded by stating that it was "possible but not probable" that Mr. Sanders could still have had the same conditions and symptoms with optimum medical treatment and that he thought the damage "could have been significantly diminished." Id.

Plaintiffs also offered the deposition testimony of Dr. Randall Brewer as an expert in neurology and pain medicine.[7] Dr. Brewer examined Mr. Sanders on several occasions, beginning in June of 2008, a year after the incident at the VAMC. On June 24, 2008, Dr. Brewer noted that Mr. Sanders's pain was located "predominately in the right buttock radiating into the distal right lower extremity." Plaintiffs' Ex. 5. Dr. Brewer conducted a neurologic examination and found it "remarkable for a sensory disturbance in the right lateral calf dorsum and ventral aspect of the right foot with sparing of the right saphenous nerve distribution." Id. Mr. Sanders reported his average pain as a 6 out of 10 and his quality of life impairment was scored at 47 out of 70. See id. At a subsequent exam on February 2, 2010, Dr. Brewer noted that Mr. Sanders's pain had "radiated to the right ankle, right calf, right foot and right thigh." Id. Mr. Sanders's quality of life impairment increased to a 57 out of 70. See id.

_____

[7] Dr. Brewer is board certified in neurology, anesthesiology, and pain medicine and specializes in neurology and pain medicine. He has been in practice at Willis-Knighton since 2005.

15

Based on his examinations and his review of the medical records, Dr. Brewer testified that Mr. Sanders has "some deficit or some injury to the sciatic nerve," which occurred at or around the time he received the injection and the subsequent infection. Plaintiffs' Ex. 9 at 14, 30, 34. Dr. Brewer explained that Mr. Sanders's life impairment scores are in the "moderate range" and amount to "significant impairment." Id. at 13, 25. He noted that Mr. Sanders has good and bad days, which is consistent with patients with chronic pain. See id. at 12. Dr. Brewer explained that

> [Mr. Sanders's] sciatic nerve injury is mild . . . in terms of the major electric pathways. The foot is working, the leg is working, but he does have pain that can be disabling, and that's unfortunate. So that just because the injury to the nerve is mild doesn't mean that there is not pain, and that's a common misunderstanding with impairment ratings . . . that pain can be as debilitating, if not more so, than a drop-foot. So I'm saying his nerve injury is mild, but I'm not discounting the fact that he does have pain.

Id. at 30. Dr. Brewer stated that he believed Mr. Sanders was capable of performing sedentary or light-duty work. See id. at 45.

As to the impact of the delay in treatment, Dr. Brewer was hesitant in offering his opinion but stated that "you have better outcomes when you treat things appropriately early and aggressively, especially with infections. Obviously his outcome wasn't terrible, but it wasn't optimal." Id. at 43. When given more information through hypothetical questions, Dr. Brewer testified to the following:

16

Q. Okay. And if the records indicate that he is progressively feeling more pain and that pain is radiating down into the leg as time goes on, that would suggest that there is an ongoing - -

A. Correct.

Q. - - process affecting the nerve?

A. I would agree with that.

Q. And earlier diagnosis and treatment would have either resulted in no pain as a result of the infection or certainly less pain?

A. Correct.

Id. at 39. He stated that "[b]ased on the delay in treatment there was a chance that the outcome could have been better." Id. at 51.

In response, the government offered the testimony of Dr. Luque by deposition.[8] Based on his examinations of Mr. Sanders and his review of the medical records, Dr. Luque concluded that Mr. Sanders has a "mild" nerve injury and chronic pain, resulting from "the scar tissue and the residual from the inflammation and infection." Record Document 33 at 12, 15. He testified that he did not believe the sciatic nerve itself was injured, because the nerve conduction studies of both lower extremities and other objective tests were normal. See id. at 9, 11, 15. Dr. Luque stated that the

---

[8] Dr. Luque is board certified in neurology. As previously mentioned, Dr. Luque serves as the Chief of Neurology at the VAMC and was one of Mr. Sanders's treating neurologists.

"only positive finding in this particular case was just [Mr. Sanders's] complaints of having pain, chronic pain," but explained that "we always believe whatever the patient tells us because pain is a subjective sensation." Id. at 10. Dr. Luque agreed that Mr. Sanders's reported pain, starting in the gluteal region and continuing down the posterior leg and below the knee, is consistent with some mild injury to the sciatic nerve. See id. at 23. He further testified that the buckling of the leg could be due to local irritation of the sciatic nerve. See id. at 28-29. Dr. Luque also confirmed that the success of gabapentin to relieve Mr. Sanders's symptoms and the need for increased doses of it over time are indications that he has a permanent injury to his nerve. See id.

As to the impact of the delay in treatment on Mr. Sanders's injury and pain, Dr. Luque testified to the following:

> Q. Okay. So is it true, then . . . that part of Mr. Sanders, the origin of his pain is from these residual changes from the abscess and the surgery; is that right?
>
> A. That's right.
>
> Q. Assuming that surgery was the proper course of treatment, he would have had these residual effects regardless; is that correct?
>
> A. Regardless, yes, when was the surgery done.

Id. at 16. Dr. Luque admitted, however, that it is "possible" that Mr. Sanders would

have had less inflammation in the low back if he had been taken to surgery sooner and that it is "possible" that if he had less inflammation of the low back, he would have had less pain from the residual inflammation. See id. at 19. He also stated that Mr. Sanders's work is the type of activity that will aggravate his pain and he would benefit by "limiting the activities that he does, especially bending and lifting weights." Id. at 51.

The court notes that Mr. Sanders's electromyogram ("EMG") and nerve conduction tests were normal. Dr. Brewer testified, however, that a patient's test could be normal yet he still have minor nerve injury and experience pain. Dr. Brewer testified that "there are cases where . . . mild nerve injury occurs and there is severe pain, but the nerve conduction study and the EMG are relatively unremarkable." Plaintiffs' Ex. 9 at 19. He explained that "[t]he EMG/nerve conduction study measures major cables, so to speak, in the electrical capacity of the nerves," but the "pain fibers are . . . smaller" and the EMG is not a good indicator of pain. Id. at 21-22. In fact, he testified that minor or partial nerve injuries are often more painful than severe nerve injuries. See id. at 23. Dr. Luque agreed with this statement. See Record Document 33 at 48.

## II. CONCLUSIONS OF LAW

Mr. Sanders is asserting a claim of medical malpractice against the United

States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), under which the United States is liable for those personal injuries caused by the negligent or wrongful act or omission of any employee of the government under circumstances where the United States, if a private person, would be held liable. Because liability in such a case is determined by state law, this medical malpractice claim based on the negligence of a physician is governed by Louisiana Revised Statute 9:2794(A).

To prevail on such a claim, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians in that specialty, that the defendant either lacked this degree of skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and that as a proximate result of the breach the plaintiff suffered injuries that would not otherwise have been incurred. See Elliot v. Robinson, 612 So.2d 996 (La. App. 2d Cir. 1993). A general physician, as opposed to a specialist, is required to exercise not the highest degree of care possible, but the degree of skill ordinarily exercised under similar circumstances by his professional peers. Additionally, according to Tarbutton v. Saint Paul Fire & Marine Insurance Company, 803 So.2d 273, 276 (La. App. 2d Cir. 2001), a physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. See id.

The court first turns to the issue of liability. In this case, the government "does not challenge the plaintiffs' claims on liability." Record Document 8 at 2. The government admits that the medical care provided to Mr. Sanders by Dr. Nguyen and the VAMC fell below the applicable standard of care. See id. Specifically, the government acknowledges that there was an "inordinate delay" of approximately three months in the diagnosis and surgical treatment of Mr. Sanders's abscesses. See id. at 3. The government further admits that the substandard care and resulting delay in diagnosis and treatment caused at least some additional injury to Mr. Sanders. See id.

The court turns next to the question of damages. The parties contest the extent of Mr. Sanders's injuries. Specifically, they contest the extent of the injury to Mr. Sanders's sciatic nerve and the pain felt in his lower back and right leg. The parties also disagree as to the permanency of Mr. Sanders's injuries, his future prognosis, and whether he is employable. Mr. and Mrs. Sanders contend they are entitled to $213,750 in general damages, including $32,500 for the permanent scarring to Mr. Sanders, $87,500 for the injury to his sciatic nerve, $48,750 for the aggravation of his pre-existing back pain, and $45,000 for his loss of enjoyment of life. The Sanders also claim $9,500 for Mrs. Sanders's loss of consortium, services, and society. As mentioned, the government admits that the substandard care caused some injury to

Mr. Sanders. The government contends, however, that the damage is minimal and difficult to distinguish from his prior injuries and from the injuries that would have resulted even with timely treatment.

## A.     Mr. Sanders's General Damages.

General damages are those that "cannot be measured definitively in terms of money" and include physical or mental pain or suffering, inconvenience, loss of enjoyment, and other losses of lifestyle. Harrison v. Richardson, 806 So.2d 954, 959 (La. App. 2d Cir. 2002). "There is no mechanical rule for determining general damages; rather, the facts and circumstances of each case must be considered." Lewis v. State Farm Ins. Co., 946 So.2d 708, 723 (La. App. 2d Cir. 2006). "Severity and duration are factors to be considered in determining an award for pain and suffering." Id. "An award for loss of enjoyment of life requires showing that the plaintiff's lifestyle was detrimentally altered or that the plaintiff had to give up activities because of the injury." Id.

The critical issue in this case is the impact of the **delay** in diagnosis and treatment on Mr. Sanders's injuries, as opposed to injury that would have occurred even with timely diagnosis and treatment. The plaintiffs do not contest that Dr. Nguyen administered the injection properly, the abscesses developed despite a proper injection, the surgical treatment would have been necessary even with a timely

diagnosis, and the surgery was properly performed. See Record Document 35. The issue is the damage caused by the **delay** in diagnosis and treatment. In addition, Mr. Sanders's injuries from the delay in treatment must be distinguished from his history of low back pain.

It is clear to the court from the evidence presented that Mr. Sanders experiences greater and more disabling pain now, following his surgery at the VAMC, than he did prior to treatment at the VAMC. Mr. Sanders currently experiences pain radiating down his right leg, below the knee and into his calf and foot, where he only experienced pain into his upper thigh before. He is also taking a much larger number and strength of pain medication than he did previously, yet still suffering pain. All of the doctors, even the government's witness Dr. Luque, agreed that Mr. Sanders suffers from chronic pain caused by a nerve injury, resulting from scar tissue and residual inflammation near his sciatic nerve. They also agreed that Mr. Sanders's pain is permanent and reducing his physical activity and work load would be beneficial.

The court also finds that the delay in diagnosis and treatment of Mr. Sanders's abscesses by Dr. Nguyen and the VAMC caused him greater injury than he would have had if the abscesses had been timely treated. The doctors all testified that the longer an infection remains untreated, the more infection there will be. The court

recognizes that the surgery was necessary and correctly performed, and Mr. Sanders would have endured some scarring and inflammation even with timely treatment. The delay by the VAMC, however, allowed the abscesses to grow larger, resulting in larger and deeper wounds with greater scarring of the tissue and damage to his sciatic nerve.[9]

The plaintiffs have also shown that Mr. Sanders's lifestyle has been detrimentally altered as a result of the substandard care by the VAMC. As mentioned, Mr. Sanders experiences greater pain now than he did prior to his treatment at the VAMC and his pain is permanent. Although Mr. Sanders continues to work full-time as a maintenance supervisor, a physically demanding job, he must take regular breaks to rest from the pain and feels pressured to hide his injuries from his employer. In addition, maintaining his full work load exhausts him and prevents him from spending time with his family and working on his house and yard. Mr. Sanders admitted that he is physically capable of working on his home but is too tired from work and must rest during off hours. Mr. Sanders's daily pain medication regime includes moderate to high doses of narcotic drugs, which make him sleepy and

---

[9] The court is not swayed by the government's argument that determining the effect of the delay in treatment on Mr. Sanders's injuries is "difficult." The court decides difficult questions of law and fact in every trial and this issue is no different.

decrease his sexual desire and capabilities. Overall, Mr. Sanders is more depressed now than he was prior to treatment at the VAMC and lacks energy and a desire to enjoy life activities. Despite the government's video footage, the court found Mr. and Mrs. Sanders's testimony credible and supported by medical records.

Accordingly, for Mr. Sanders's sciatic nerve injury with associated radiating pain into his hip, leg, and foot requiring a steadily increasing dosage of pain medication, the court awards him $75,000.00. This injury is superimposed upon a pre-existing low back injury caused by a fall from a ladder in 2005. The added, longer lived bodily insult with worsened increases of pain and palliative medicines is the basis of an award of $45,000.00. The testimony of both Mr. and Mrs. Sanders relate an impressive blow to the former lifestyle of their close-knit family unit. When a sleeping husband screams aloud from pain, when an extended list of serious medicines affect the sex life of the couple, when the off-time social activity is severely limited, without an end in sight, the law recognizes damage awards for loss of enjoyment of life. An appropriate award to a fifty year old man for this extended loss is $40,000.00.

The requested award for scars on his low back and buttock, however, is not found to be appropriate. It is undisputed that the surgery was necessary and Mr. Sanders would have had two scars even absent the delay in treatment. Additionally,

Mr. Sanders's scars, located on his lower back and right buttock, are not visible except, perhaps, to his wife.[10] Although it is possible that Mr. Sanders's scars would have been smaller with timely treatment, the court finds this is insufficient to warrant an award of damages. These out-of-sight afflictions are non-compensable.

In sum, the court finds that the plaintiffs are entitled to $160,000.00 in general damages for the injury to Mr. Sanders's sciatic nerve, the aggravation of his pre-existing back pain, and his loss of enjoyment of life.

**B.    Mrs. Sanders's Loss Of Consortium Claim.**

Mrs. Sanders claims she is entitled to general damages in the amount of $9,500 for her loss of consortium. "[A] claim for loss of consortium has seven elements: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of

---

[10] In support of their argument, the plaintiffs cite Dennis v. The Finish Line, Inc., 781 So.2d 12 (La. App. 1st Cir. 2000) and De Los Reyes v. USAA Casualty Insurance Co., 677 So.2d 668 (La. App. 2d Cir. 1996). Unlike Mr. Sanders, however, the plaintiffs in Dennis and De Los Reyes suffered visible scarring that affected their self-images and lifestyles. In Dennis, the plaintiff sustained muscle weakness, causing the left side of her face to "droop." Dennis, 781 So.2d at 31. She also had a long scar above her left ankle and a scar and sunken area on the back of her upper left thigh where she lost muscle tissue. The plaintiff in De Los Reyes sustained a 3 centimeter flat scar on her left ankle, a 9 centimeter scar on her left knee, a 20 x 0.5 centimeter scar on her right thigh, and a 5 centimeter scar on her left thigh. The court noted that she was self-conscious about her scars and wore dark hose to conceal them. She also was forced to give up modeling. Mr. Sanders's scars, hidden from public scrutiny, are easily distinguishable.

sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity." <u>Lewis</u>, 946 So.2d at 724.

It is evident to the court from the testimony presented that Mr. Sanders's injuries have impacted his relationship with Mrs. Sanders. Mr. and Mrs. Sanders both testified that they no longer enjoy a sexual relationship and that Mr. Sanders's medical condition has limited their ability to go out to dinner and participate in other activities as a family. In addition, Mrs. Sanders spent two weeks changing Mr. Sanders's bandages, requiring her to clean and pack his deep surgical incision with saline soaked gauze twice a day. She continues to bring him dinner in bed, assist him in dressing, and help administer a complex assortment of medicines. For Mrs. Sanders's claim for loss of consortium (and for her duties as nurse), she is awarded $10,000.00.

### III. CONCLUSION

In conclusion, the court rules that the delay in diagnosis and treatment of Mr. Sanders's abscesses by Dr. Nguyen and the VAMC caused injury to Mr. Sanders's sciatic nerve and aggravated his pre-existing condition. The court finds that Mr. Sanders is entitled to $75,000 for the injury to his sciatic nerve, $45,000 for the aggravation of his low back injury, and $40,000 for the loss of enjoyment of life, for

a total of $160,000.00 in general damages.  In addition, the court finds that Mrs. Sanders is entitled to $10,000.00 in damages for loss of consortium.  A judgment consistent with the terms of this ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana, this 23rd day of May, 2011.

_____
JUDGE TOM STAGG